STATE OF VERMONT

SUPERIOR COURT                                    ENVIRONMENTAL DIVISION

|  | } |  |
| --- | --- | --- |
| In re Musto Construction Permit | } | Docket No. 132-7-09 Vtec |
| (Appeal of Hignite) | } |  |
|  | } |  |

Decision and Order

Appellant Carolyn K. Hignite appealed from a decision of the Development Review Board (DRB) of the Town of Castleton, granting approval to Appellee-Applicants David and Martha Musto to construct a year-round residence. Appellant is represented by Mark L. Sperry, Esq.; Appellee-Applicants (Applicants) are represented by Gary R. Kupferer, Esq. and Timothy Budd, Esq.; and Interested Party Allan Keyes, Esq., an attorney licensed in Vermont, entered an appearance representing himself. The Town of Castleton did not enter an appearance in this matter.

An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge. A site visit was taken at the conclusion of the hearing with the parties and their representatives, including viewing the parties' properties and the vicinity from the lake by boat. Upon consideration of the evidence as illustrated by the site visit, and of the written memoranda and requests for findings filed by the parties, the Court finds and concludes as follows.

Findings Relating to Project Proposal

Applicants own a 0.38-acre (approximately 16,553 square feet) existing small lot on the easterly shore of Lake Bomoseen in the Residential 40,000 (R-40) zoning district of the Town of Castleton. The lot approximates a long, narrow triangle in shape, with a westerly boundary of 98.4 feet along the lake shore, a northerly boundary of 244.64 feet,

1

an easterly boundary of 25 feet on the truncated end of the triangle, and a southerly boundary of 280 feet.

Applicants' lot contains an existing one-story single-family house, approximately 18 feet in height, in use as a seasonal residence. The Zoning Ordinance does not distinguish between seasonal and year-round single-family residences. In the R-40 zoning district, a single-family residence is a permitted use. The lot slopes down from the east towards the elevation of the lake to the west. Three existing decks, with their associated stairways and landings, are located to the west of the existing house. Two of these decks, eight feet in width, labeled as the "upper" decks on Diagram 1, are attached to the house at the level of the ground floor or living area of the house. A set of stairs leads down from each of these decks to a landing located between the decks in the center of the westerly side of the house. From the landing, an additional short flight of stairs leads down to another deck at ground level on the lake side of the existing house.

The dimensional requirements applicable to a lot containing a residential use in the R-40 zoning district, found in Article V of the Zoning Ordinance, are a minimum lot size of 40,000 square feet, a maximum lot coverage of 15%, a minimum lot frontage of 150 feet, a minimum lot depth of 200 feet, a maximum building height of 38 feet, a front setback of 50 feet, a side setback of 30 feet, and a rear setback of 50 feet.

The Zoning Ordinance does not contain a shoreline overlay zoning district or any setback requirements specifically applicable to the distance from a building to the lake. However, whether the lake is considered to be the property's front or rear property line, the required setback on the property's westerly or lake side is 50 feet. For the sake of clarity, this decision will refer to it as the shoreline setback rather than characterizing it as the front or the rear setback.

Applicants' lot is nonconforming with the zoning requirements as to lot size, lot frontage, and lot depth. However, it meets the minimum area, frontage, and width or

2

depth requirements for development as an existing small lot under §§ 1001 and 1002 of the Zoning Ordinance and the equivalent statutory sections.  24 V.S.A. § 4412(2).

Setbacks are measured from the relevant boundary line to nearest wall, porch, or deck of the building or structure, whether enclosed or unenclosed.  Article IX of the Zoning Ordinance, "Setback."  The existing house on Applicants' lot is nonconforming with the zoning requirements as to both side setbacks and as to the setback to the lake.[1] Diagram 1 shows the outline of the existing one-story house and existing decks, and shows the portions of these structures that extend into and are therefore nonconforming with each of the three setbacks. The area of the existing house that extends into the southerly side setback is labeled as Area 1 on Diagram 1.  The area of the existing house that extends into the northerly side setback is labeled as Area 2 on Diagram 1.  All of the existing decks, landings, and stairs located on the westerly side of the existing house are located within the shoreline setback.  A small portion of the south upper deck, shown as shaded on Diagram 1, is located within the south side setback as well as within the shoreline setback.

Applicants propose to demolish the existing one-story camp building and build a larger, year-round house on the lot.  The house is proposed to consist of three stories: a ground or first floor at the elevation of the existing house, but larger in footprint; a new walk-out basement level, below the elevation of the existing single-story house; and a new upper or second floor above the elevation of the existing single-story house, and larger in footprint.  The height of the proposed house, measured from the floor of the walk-out basement to the peak of the roof, is proposed to be 35 feet.

As shown on Diagram 2, several areas of the proposed house will occupy areas of the setbacks that are currently open and unoccupied by the existing nonconforming building.  The area of the proposed house that extends into a currently clear portion of

---

[1]  The setback to the lake should actually be depicted as irregular, paralleling the shoreline, as it is measured at 50 feet from the shoreline.

the southerly side setback is labeled as Area A on Diagram 2. The area of the proposed house that extends into a currently clear portion of the northerly side setback is labeled as Area B on Diagram 2. The new areas of the proposed house that are proposed to occupy currently clear areas of the side setbacks do not extend any closer to the side boundary lines than the farthest extent of the existing nonconforming house.

In addition, a new ten-foot-wide deck is proposed to extend across the westerly side of the proposed house, at the level of the ground floor of the proposed house, that is, above the level of the walk-out basement. Areas C and D on Diagram 2 show the currently clear areas of the shoreline setback that will be occupied by the new deck.

Appellant Carolyn Hignite and her brother, Interested Person Allan Keyes, together with another brother, own the lot directly to the south of Applicants' lot. The Hignite-Keyes lot has been in their family since 1948. It contains a one-story house over a crawl space, in use as a seasonal residence, with an enclosed screened porch along its west side overlooking the lake. The southerly wall of the existing building on Applicants' property is approximately 67½ feet (on the eastern end) to 75' feet (on the western end) from the northerly wall of the Hignite-Keyes camp building. A number of large mature trees on the Applicants' lot, to the south of the existing house, are proposed to be removed for the construction of the house or for the construction of the septic system to serve the house. Findings and conclusions regarding whether the proposal will have a significant adverse effect on the Hignite-Keyes property are discussed in the text at note 6, infra.

In 2002, Appellant Hignite had appealed to this Court a decision of the then-Castleton Zoning Board of Adjustment (ZBA) regarding the decks and stairs constructed by Applicants' predecessor, Dr. Roshan Sivagnanam. That appeal, In re Appeal of Hignite, No. 49-2-02 Vtec, was settled by the August 10, 2006 entry of a Consent Order and Decree (Consent Order), which by its terms runs with the land and is binding on the parties and their heirs, successors and assigns. The Consent Order

4

provided that the court "shall retain jurisdiction for the purposes of enforcing" the Consent Order. The Consent Order reversed and vacated the ZBA decision, concluding instead that the deck construction had required a permit, and substituted the Consent Order as a final zoning permit for the deck modification and construction permit. The Court Order established the restricted area in the southwest portion of Applicants' lot as shown on Diagram 3 and required the removal of the southside deck and replacement of a south-facing sliding glass door with a smaller window in its pre-existing location; the work required by the Consent Order has been done. The Consent Order prohibited the placement of additional windows or doors in the south wall of the camp or so as to face the Hignite-Keyes camp.

As well as establishing the restricted area, ¶ 4 of the Consent Order provides that "no structure, including stairs, whether temporary, seasonal or permanent, shall hereafter be constructed or placed within any other front, rear or side setback area imposed by the then[-]applicable Castleton Zoning Bylaw." Paragraph 8 of the Consent Order further provides that "any future expansion or alteration of the footprint" or "erection of any other new structure" on Applicants' property will be "subject to all requirements of the Castleton Zoning Bylaw, including setbacks."

Eligibility of Project for Consideration under § 709

Regulatory Context

Since 1987, the minimum setbacks applicable to the R-40 zoning district at Lake Bomoseen have been 30 feet for the side setbacks and 50 feet for the front and rear setbacks. Section 204(F) of the 2008 Zoning Ordinance provides in pertinent part that "[n]o yard . . . existing at the time of passage of this Regulation shall be reduced in dimension or area below the minimum requirements set forth herein."

Under the 2004 state zoning statute amendments first allowing municipalities to provide for waivers of dimensional requirements, 24 V.S.A. § 4414(8), the 2008 Zoning

Ordinance provides in § 1208 for waivers of dimensional requirements such as setbacks, but limits eligibility for such waivers to small additions that do not increase the footprint of the structure by more than 200 square feet.  Section 1208(C)(4) provides that, with a waiver, no side setback shall be reduced to less than 15 feet.  Section 1208(D) allows the DRB to impose "conditions regarding the design and screening of the addition to mitigate any impacts on neighboring properties."

Section 709

The 2004 state zoning statute also redefined nonconformities, including nonconforming structures, 24 V.S.A. § 4303(14), and required all municipalities to address in their bylaws "how nonconformities will be addressed, including standards for nonconforming . . . structures."  24 V.S.A. § 4412(7).  Section 4412(7)(A) authorizes municipalities to "regulate and prohibit expansion and undue perpetuation of nonconformities" to achieve the purposes of zoning set forth in § 4302.  The statutory language is consistent with Vermont case law recognizing that a function of zoning is to limit the expansion and undue perpetuation of nonconformities.  See In re: Kirschner Home Constr. Application, No. 226-10-07 Vtec, slip op. at 15 (Vt. Envtl. Ct. Sept. 25, 2008) (Wright, J.) (purpose of zoning is to phase out nonconformities); In re Smith, 2006 VT 33, ¶ 10, 179 Vt. 636 (mem.) (ultimate goal of zoning is gradual elimination of nonconforming uses); In re Casella Waste Mgmt., Inc., 2003 VT 49, ¶ 9, 175 Vt. 335 ("primary goal of zoning is to gradually eliminate nonconforming uses").  Further, § 4412(7)(A) specifically allows municipalities to "specify the extent to which, and the circumstances under which" a nonconformity may change or expand, or be rebuilt.  24 V.S.A. §§ 4412(7)(A)(ii), (v).

Carrying out this statutory authorization, § 709 of the Zoning Ordinance regulates expansion of a nonconforming structure containing a conforming use.  Section 709 provides in full that:

[n]onconforming structures with conforming use may be continued

6

indefinitely, but:

A.    Shall not be moved, enlarged, altered, extended, reconstructed or restored except upon approval of the [DRB] following a public hearing after public notice if the [DRB] finds and concludes that:

   1.    there will be no significant adverse effect on traffic in the vicinity;

   2.    there will be no significant adverse effect upon surrounding property; and

   3.    there will be an increase in area not to exceed the total ground area covered subject to Article V restrictions. Nonconforming setbacks cannot be made more nonconforming and conforming setbacks cannot be made nonconforming.  However, structures may be moved toward the center of a lot provided the sum total of the side setbacks is not decreased.*[2]

B.    This section shall allow, upon approval of the [DRB], the addition of a second story on a non-conforming structure that is a conforming use.  Any such second story shall not be considered an expansion of nonconformity.

C.    Nothing in this section shall be deemed to prevent normal maintenance and repair of a non-conforming structure provided that such action does not increase the degree of nonconformity.[3]

Appellant first argues that § 709 is not applicable at all to a proposal such as the present one that proposes demolition of the existing nonconforming structure and construction of a new structure that exceeds the volume occupied by the existing structure.    However,  in  § 709(A)  the  Zoning  Ordinance  specifically  allows  a nonconforming structure (housing a conforming use) not only to be moved, enlarged,

---

[2]   An asterisk appears in the ordinance but the ordinance contains no corresponding note to which the asterisk might refer.

[3]   Section 708 of the Zoning Ordinance also addresses maintenance of a noncomplying structure, providing in full that "a non-complying structure may be normally maintained and repaired provided that such action does not increase the degree of non-compliance."

altered or extended, but it also authorizes such a building to be reconstructed or restored, which incorporates the concept of demolition and reconstruction.

Neither In re Stowe Club Highlands, 164 Vt. 272 (1995), nor this Court's decision in In re: Delano Variance Application, No. 161-8-07 Vtec (Vt. Envtl. Ct. Aug. 29, 2008) (Durkin, J.), requires a contrary result. Both of those cases involved ordinances that provided for expansion or alteration, but did not provide for reconstruction or replacement. By contrast, because § 709(A) includes reconstruction as well as enlargement and extension, it covers a project that involves both the building of a replacement structure within the footprint and volume of the existing structure and the enlargement or expansion of the existing structure into a new volume or area. Therefore, the demolition and building project involved in the present application does come within the scope of § 709.

### Section 709(A)(3)

However, the proposal before the Court fails to meet § 709(A)(3) and is therefore not eligible for approval by the DRB or this Court.[4] While certain areas of the volume of the proposed new house—those below the ground surface, those within what would have been a second story above the existing house, and those complying with the setbacks—would be eligible for consideration under § 709, other areas of the volume of the proposed new house violate § 709(A)(3).

---

[4] If the proposal were not precluded by § 709(A)(3), it would be necessary to proceed to Appellant's argument that it also violates ¶ 4 of the 2006 Consent Order, In re Appeal of Hignite, No. 49-2-02 Vtec (Vt. Envtl. Ct. Aug 10, 2006), because the proposal places new volumes of structure "within any . . . front, rear or side setback area." However, any action to enforce the 2006 Consent Order must be brought, by post-judgment motion or otherwise, with reference to Docket No. 49-2-02 Vtec and not in the present separate appeal.

Increase in Ground Area Subject to Setback Restrictions

The proposal fails to meet the first sentence of § 709(A)(3). The plain language of the first sentence of § 709(A)(3) requires that the ground area covered by the new building does not increase the ground area of the existing building that was already within the setback area (that is, the ground area subject to the Article V setback restrictions that is already covered by the existing building). It allows the new building to be expanded into ground area that complies with the setbacks, but not into ground area that is within the setback restrictions of Article V of the Zoning Ordinance. This language is awkward, because it was carried forward from several earlier versions of the zoning ordinance, but its meaning is clear.

This interpretation of the first sentence is supported by the statutory purpose authorizing § 709, which is to "regulate and prohibit the expansion and undue perpetuation of nonconformities," not to facilitate their expansion. This is consistent with 24 V.S.A. § 4412(7)(A) and the public interest in the elimination of nonconformities enunciated by our Supreme Court. In re Gregoire, 170 Vt. 556, 559 (1999) (mem.) (there is a strong public interest in the regulation and elimination of nonconforming uses and the goal of zoning is to gradually eliminate them).

This interpretation of the first sentence of § 709(A)(3) is also supported by an examination of the previous versions of the zoning ordinance from which it was derived. First, it uses the term "ground area" to distinguish the restriction from an earlier version of the ordinance amended in 1997 that allowed a 50% increase in "floor area" or "gross area" above that contained in the existing building. Appeal of Keough, No. 244-11-02 Vtec, slip op. at 3 (Vt. Envtl. Ct. Oct. 8, 2003) (Wright, J.). The terms "floor area" or "gross area" referred to the total interior space on all floors of the building, so that a two-story building would have twice the floor area of a one-story building with

9

the same footprint or ground area covered.[5]  Second, the most recent prior version of the zoning ordinance had allowed a 15% increase in the ground area covered within the restricted setback areas.  The fact that the ordinance was amended to delete the 15% increase supports the interpretation that the present version of the ordinance prohibits the expansion of a nonconforming building into areas of the setback not already occupied by the existing nonconforming building.  See State v. Muscari, 174 Vt. 101, 106 (2002) (citing Jones v. Dept. of Employment Sec., 140 Vt. 552, 555 (1982)) ("amendment of [ordinance] shows legislative intent to change effect of existing [ordinance]).

Accordingly, the fact that substantial areas of the proposed building extend into areas of the setbacks that are now clear is sufficient to deny approval of the proposal under the first sentence of § 709(A)(3).

Increase in Nonconformity of Nonconforming Setbacks and Making Conforming Setbacks Nonconforming

Moreover, the proposal also fails to meet the second sentence of § 709(A)(3) in that it makes nonconforming setbacks more nonconforming, and makes areas that are now conforming to the setbacks nonconforming.  Specifically, with reference to Diagram 2, the increases in width of the decks represented by Areas C and D make the nonconformity with the shoreline setback more nonconforming.  The substantial additional area of the north side setback occupied by the new house that is represented by Area B on Diagram 2 makes a conforming segment of the north side setback nonconforming to a height of one to two stories within that setback.  The small additional area of the south side setback occupied by the new house that is represented by Area A on Diagram 2 similarly makes a conforming segment of the south side

---

[5]  Appellant also argues that the proposal represent an impermissibly large expansion of interior space within the new building; however, the present § 709 does not regulate or limit the expansion of interior or living space.

10

setback nonconforming to a height of one to two stories within that setback. Similarly, it violates § 204(F) by reducing the side yards (setback area) in dimension and area below the minimum requirements set forth in Article V.

Applicants argue that the second sentence of § 709(A)(3) should instead be interpreted to mean that they are allowed to expand the nonconforming building all along both side property lines to as close to the north side property line as the farthest extent of the northwest corner of the existing building and to as close to the south side property line as the farthest extent of the southeast corner of the existing building, as shown in Diagram 3. They also argue that the existing lakeshore setback applicable to the decks extends towards the lake as close as the farthest extent of the existing lower open deck, without regard to whether the lower deck is a separate structure from the house and its attached upper decks.

The fundamental purpose of zoning is to eliminate nonconformities. See Kirschner Home Constr. Application, No. 226-10-07 Vtec, slip op. at 15 (Vt. Envtl. Ct. Sept. 25, 2008) (Wright, J.); Casella Waste Mgmt., 2003 VT 49, ¶ 9. This purpose is echoed by 24 V.S.A. § 4412(7), which allows municipalities to regulate "expansion and undue perpetuation of nonconformities." A nonconforming building may be allowed to remain and even to expand or be reconstructed as regulated, but nothing in the state statute or court decisions suggests that a nonconforming building somehow gains an advantage beyond that enjoyed by a conforming building, to expand the nonconformity within the setback area along the entire property line.

In interpreting zoning ordinances, the Court applies the familiar rules of statutory construction, first construing words according to their plain meaning, and "giving effect to the whole and every part of the ordinance." In re Champlain Coll. Maple St. Dormitory, 2009 VT 55, ¶ 13, 186 Vt. 313 (quoting Stowe Club Highlands, 164 Vt. at 279). That is, the Court must presume that all language in the ordinance was inserted for a purpose and the Court cannot allow a significant part of the ordinance to

be rendered mere surplusage. In re Miller, 2009 VT 36, ¶ 14, 185 Vt. 550. Applicants' interpretation would render § 709(B), which allows a second-story addition to a nonconforming structure so that the addition does not constitute the expansion of a nonconformity, surplusage. Under Applicants' interpretation, the second sentence of § 709(A)(3) would render this exemption for an additional story on a nonconforming structure unnecessary, because an increase in height within the existing nonconforming footprint would not bring the building any closer to the boundary line than the existing nonconforming ground floor of the structure.

In the absence of a plain meaning, courts attempt to discern the legislative intent from other sources and the overall context or purpose of the ordinance. Shea v. Metcalf, 167 Vt. 494, 498 (Court resolves ambiguity by looking at the context of statutory language, subject matter, and effects of interpretation). Applicants argue that the Castleton DRB has interpreted § 709(A)(3) to support their argument, and have submitted fourteen decisions of the DRB in other cases, which, they argue, allowed similar expansions of houses in the Lake Bomoseen area.

Although a DRB's consistent interpretation of a zoning ordinance "can be determinative in a close case," In re Korbet, 2005 VT 7, ¶ 10, 178 Vt. 459 (quoting In re Maple Tree Place, 156 Vt. 494, 499–500 (1991)), the weight to be accorded to such an interpretation "depends on the explanation of 'a reason or rationale for [the DRB's] decision'" as well as a demonstration that the interpretation has been consistent." Korbet, 2005 VT 7, ¶ 10 (quoting In re Appeal of Chatelain, 164 Vt. 597, 598 (1995)). In the present case, neither the first nor the second sentence of § 709(A)(3) is ambiguous and both preclude the present application, as does § 204(F). Even if those sentences were ambiguous, the context of the remainder of the ordinance, and the enabling authority of the state statute, require that expansion of a nonconforming structure be restricted to minimize any increase in nonconformity.

Moreover, even if this were the sort of close case in which the DRB's consistent

interpretation would be useful, see <u>Champlain Coll. Maple St. Dormitory</u>, 2009 VT 55, ¶¶ 11–14, the DRB has not given any reason or rationale in any of the decisions, nor has it even given any interpretation of § 709(A)(3) in any of the decisions supplied by Applicants.[6] The Court is not obligated to perpetuate an error. See <u>Korbet</u>, 2005 VT 7, ¶ 10.

Appellant Hignite and Interested Person Keyes provided testimony of the evident importance to them of maintaining the rustic camp nature of their immediate Masons Point neighborhood and especially of Applicants' property, even though they recognize that many properties around the lake have converted to large year-round residences. Both parties presented evidence from experts and others as to the appearance, materials, and aesthetics of the proposed house and as to the effect of the proposal on surrounding properties. However, as the present proposal is not eligible for consideration under § 709(A) by the DRB, and hence this Court, it would be entirely advisory to make findings as to its effect on surrounding properties, whether any effect on the Hignite-Keyes property would be adverse, or, if adverse, whether any adverse effect would be significant.[7]

---

[6] To the extent that anything can be determined from comparing each decision with its respective application materials, if these decisions have created any new nonconformities "improperly authorized as a result of error," as defined in 24 V.S.A. §§ 4303(13)–(15), they have not come before this Court for interpretation of § 709. Compare <u>In re Barry and Clyde's Place LLC</u>, 2011 VT 7, ¶ 20.

[7] It is would also be an impermissible advisory opinion to determine Question 6 of the Statement of Questions as to whether the regulatory standard of "significant adverse effect on surrounding properties" is unconstitutionally vague, except to note that the two prior cases decided by this Court under that standard and cited by Appellant: <u>In re Appeals of Jackson and Appeal of McCue</u>, Nos. 165-9-99, 43-2-00, 190-9-00, 258-12-99 Vtec (Vt. Envtl. Ct. June 8, 2001) (Wright, J.) and <u>Keough</u>, No. 244-11-02 Vtec (Vt. Envtl. Ct. Oct. 8, 2003) were both issued by this Court prior to the Vermont Supreme Court's decision in <u>Appeal of JAM Golf</u>, 2008 VT 110, ¶¶ 13–14.

Accordingly, based on the foregoing, it is hereby ORDERED and ADJUDGED that Appellee-Applicants' application is DENIED for failure to comply with § 709(A)(3) as to the expansion of nonconforming structures, concluding this appeal.

Done at Berlin, Vermont, this 27th day of January, 2011.

_____
        Merideth Wright
        Environmental Judge